PATTON   *v.*   CHATTANOOGA.

(*Knoxville.*   November   23,   1901.)

1. MUNICIPAL CORPORATIONS. *Injunction of ordinances by tax-payers.*

It is essential, in a bill brought by citizens and taxpayers to enjoin a city ordinance on account of its alleged invalidity, that complainants aver that they are, or will be, subjected by such ordinance to some loss, burden, injury, or deprivation of rights peculiar to themselves, and not imposed alike and in common upon the entire community. Matters of common interest, affecting alike all members of the community, are within the exclusive jurisdiction of the city authorities. (*Post, pp. 217-229.*)

Cases cited: Ford *v.* Farmer, 9 Hum., 160; Lynn *v.* Polk, 8 Lea, 121; Kennedy *v.* Montgomery County, 98 Tenn., 165; Colburn *v.* Chattanooga, 2 Shan. Cas., 22; Bradley *v.* Commissioner, 2 Hum., 432; Maury County *v.* Lewis County, 1 Swan, 245; Bridgenor *v.* Rodgers, 1 Cold., 260; Morris *v.* Nashville, 6 Lea, 340; Bouldin *v.* Lockhart, 1 Lea, 200.

2. SAME. *Same.*

And the ordinance involved in this case, granting a franchise for the construction and operation of a telephone and electric plant within the city, is not of a nature that inflicts or imposes upon the complaining citizens any loss, burden, injury, or deprivation of rights that is not common to the entire body of citizens and taxpayers. (*Post, pp. 198-229.*)

3. SAME. *Same.*

Citizens and taxpayers, as such, cannot maintain a suit to test the validity of an ordinance because they may conceive it to be void as granting an exclusive franchise contrary to the public good and sound policy. The advisability of granting an exclusive franchise is one for the city authorities. The validity of such an ordinance can be questioned on the ground

of its exclusiveness only by the claimant of a conflicting interest.   (*Post, pp. 229-233.*)

FROM   HAMILTON.

Appeal from the Chancery Court of Hamilton County.  WM. S. BEARDEN, setting by interchange.

COOKE, SWANEY & COOKE, PRITCHARD & SIZER, THOMAS & THOMAS, C. R. EVANS and A. W. GAINES for complainants.

E. S. DANIELS, MURRAY & MURRAY, SHEPHERD & FRIERSON for defendants.

SNODGRASS, C. J.  On the 20th of November, 1900, the Board of Aldermen of the city of Chattanooga passed the following ordinance:

"An ordinance granting T. S. Wilcox and associates the right to establish an electrical plant in the city of Chattanooga; to put up and maintain a telephone, telegraph and electrical exchange; to erect poles, wires, cables, and all necessary devices, appliances and constructions, including the privilege of constructing underground conduits, and erecting, running, and maintaining underground wires; together with all necessary de-

vices and appliances for the conduct of a general telephone, telegraph and electrical plant in the city of Chattanooga.

"SECTION 1. Be it ordained by the Mayor and Aldermen of the city of Chattanooga, Tenn., that the right is hereby granted to T. S. Wilcox and his associates, successors and assigns, for the term of twenty-one years, to erect, construct and build an electrical plant in the city of Chattanooga; to put in and maintain a telephone, telegraph and electrical exchange; the right to use the streets, alleys, roads, lanes, ways and courts of Chattanooga; to erect telephone and telegraph poles, wires, cables and all necessary devices, appliances, constructions, including underground conduits, and all necessary things ' and constructions to operate telephone, telegraph and electrical communications and devices; to establish and maintain telephone, telegraph and electrical exchanges; to carry on, operate and control telegraph, telephone and all manner of electrical communication. And the right is hereby granted them to place their wires above or under ground, so as to enable them, in the most convenient and suitable manner, to conduct their said electrical communications. But it is hereby understood that the poles, structures, conduits and other appliances of the said T. S. Wilcox, his associates, successors and assigns, herein permitted to be constructed in the streets, roads, alleys, lanes, courts and other high-

ways of the city of Chattanooga, is herein granted upon the distinct understanding that the same are to be so placed and put that no unnecessary and improper obstructions to the streets and ways of said city shall occur therefrom.

"SEC. 2. Be it further ordained, That the city of Chattanooga shall have the right to use the poles set in the streets, for fire alarms, free and without compensation; that all poles, subways and conduits are to be located under the direction of the city engineer, and such poles shall be sufficiently high as to in no way interfere with the business of the streets on which the same are located. The city reserves the right to regulate this privilege from time to time as the city may increase in population or necessity demands.

"SEC. 3. Be it further ordained, That the SOLE right to construct, provide, build, establish and maintain underground conduits or subways, in which to plant, carry or hang electrical wires, and all other appliances, and to conduct pipes for water, oil or gas, is hereby granted to the said T. S. Wilcox and his associates, their successors and assigns, for the term of twenty-one years, with the distinct understanding that the said T. S. Wilcox and his associates, their successors and assigns, shall make such subways or underground conduits, as aforesaid, ample at all times, either by original construction or by subsequent enlargement or extension, at the demand

of the municipal authorities, after sufficient notice, to accommodate the wires of all companies that may be required or desired to be put under ground of a like voltage with the wires of the said T. S. Wilcox and associates, and all pipes and other things needed to be so carried; provided, that the same will not interfere with the purposes for which the conduits are intended, and that all owners of such wires, cables and other electrical conductors, and transmitting devices within the city of Chattanooga as shall be so required or desired to be conducted over, through and under said highways, or any such apparatus, underground subways or conduits, as aforesaid, shall pay for the use of such subways and other devices belonging to the said T. S. Wilcox and his associates, their successors and assigns, a reasonable rental per annum, the same to be mutually agreed upon by the parties thereto interested; and in case of disagreement as to said rental, an arbitration may be required by either party thereto, and shall be heard by three disinterested persons, one to be chosen by said T. S. Wilcox and associates, their successors and assigns, one by the person or company whose wires are to be placed in said conduits or underground ways, and one by the Board of Mayor and Aldermen of the city of Chattanooga, for and in behalf of the city. The findings of the said board of arbitration shall be final as to all parties.

"SEC. 4. Be it further ordained, That, in consideration of this franchise, the said T. S. Wilcox and associates, their successors and assigns, will furnish the city of Chattanooga twelve telephones free, and to the county buildings inside the city limit eight telephones free, for the use of such buildings. And the said T. S. Wilcox and associates, their successors and assigns, agree to pay the city one per cent. of the gross receipts derived from the business within the city limits of Chattanooga, Tenn., for the first fifteen years after it begins operation, and thereafter two per cent. of such gross receipts.

"SEC. 5. Be it further ordained, That this franchise is granted upon the express stipulation and agreement upon the part of the said T. S. Wilcox and associates, their successors and assigns, that the telephone service shall be metallic circuits, and that all instruments used shall be of the long-distance, solid-back type.

"SEC. 6. Be it further ordained, That this franchise is granted to the said T. S. Wilcox and associates, their successors and assigns, with the distinct understanding that it is not in any way to interfere with any franchise heretofore granted or any of the vested rights of any individual or corporation under such franchise.

"SEC. 7. Be it further ordained, That the city of Chattanooga, Tenn., hereby reserves the right at any time to purchase of the said T. S.

Patton *v.* Chattanooga.

Wilcox and associates, their successors and assigns, any and all conduits constructed under the provisions, and in consideration of the rights and franchises herein granted, the purchase price to be agreed upon by and between the parties; and in case they fail to agree, the price is to be fixed by arbitration; said T. S. Wilcox and associates, their successors and assigns, are to select one arbitrator, the Board of Mayor and Aldermen to select one, and the two so selected to select the third; the award of the said arbitrators to be final and binding upon the parties. And after the award has been made, the said T. S. Wilcox and associates, their successors and assigns, will, in compliance with the award, turn over and deliver to the city such conduits when the city, upon its part, complies with the award.

"SEC. 8. Be it further ordained, That this ordinance take effect from and after its passage, the public welfare requiring it."

Its passage aroused antagonism, and a number of citizens petitioned the Mayor to veto it. These petitioners pointed out five objections to the ordinance:

1. Omission of usual provisions fixing maximum rate for telephone service.

2. Omission of requirement as to when work on telephone system should begin, and when same should be completed.

3. Omission of requirement to restore pavements and streets.

4. Omission to prohibit sale to or consolidation with old telephone company.

5. That the exclusive feature with respect to the conduit system is unnecessary and dangerous.

The Mayor thereupon asked the city attorney for an opinion as to what safeguards were necessary to properly protect the city's interests. The latter replied, suggesting provisions covering the very five objections specified in the citizens' petition.

The Mayor vetoed the ordinance in a lengthy message. He based his veto on the five objections already stated, and assigned the additional reasons:

1. That the ordinance granted more than one franchise, which he deemed unwise.

2. That the plan of arbitration provided was defective, in that it gave the power to the grantees to prevent an arbitration.

He specified his objections to the exclusive feature as to the conduits as follows:

1. That the ordinance granted the exclusive right to build conduits, lay wires, etc., under the streets, and that, therefore, no person or company hereafter required or desiring to lay wires or other appliances under ground, could do so, but such person or company would be forced to use the conduits of Wilcox and associates.

2. That if the city should desire to build waterworks, it could not use the streets for that purpose, but must deal with Wilcox and associates.

On December 4, 1900, the ordinance was passed over the Mayor's veto by a vote of 13 to 3. Upon taking the vote, one of the Aldermen presented and read the following written explanation, which was signed by twelve of the thirteen Aldermen voting with him, viz.:

"The undersigned Aldermen respectfully submit the following explanation of their votes to pass over the Mayor's veto, an ordinance entitled an ordinance granting to T. S. Wilcox and associates, etc., passed by the Board, November 20, 1900, viz.: We voted for said ordinance because we believed the public welfare would be best served by permitting the organization and operation in Chattanooga of another telephone company, and the building of underground conduits or subways for wires, pipes, etc. We are still of this opinion, and believe that it is also the opinion of a large majority of the people of Chattanooga. But we have become convinced that there should be some further restrictions placed upon the franchises granted by said ordinance.

"T. S. Wilcox and associates have agreed, in writing, to accept the franchises subject to these restrictions and limitations, which we believe will fully protect the interests of the city and make

it desirable that the franchise be granted. An ordinance has been prepared, carrying this into effect. We will present this ordinance and ask that it be passed on three readings at the present meeting, under suspension of the rules.

"Believing that this relieves the franchise granted of any objectionable or unwise features, we shall vote to pass the ordinance over the Mayor's veto. We ask that this paper be spread upon the minutes as a part of the proceedings of this Board," which was done.

Thereupon the following amendatory ordinance, with its recitation of tender of acceptance by Wilcox and associates, was introduced and passed at same meeting.

"An ordinance to amend Ordinance No. 1133, page 432, Book E, passed November 20, 1900, and passed over the Mayor's veto, December 4, 1900, and entitled 'An ordinance granting T. S. Wilcox and associates,' etc., and to add to the contract evidenced by said ordinance, certain restrictions and limitations, based upon the written stipulation and agreement of the grantees of the privileges granted under said ordinance.

"Whereas, on November 20, 1900, an ordinance was passed by this board, entitled 'An ordinance granting to T. S. Wilcox and associates,' etc., and said ordinance has been, on December 4, 1900, passed over the Mayor's veto; but, whereas, prior to the passage of said ordinance over the

Mayor's veto, said T. S. Wilcox and associates entered into and signed the following agreement, further fixing the terms and conditions upon which the rights, privileges and franchises upon by said ordinance shall be exercised and enjoyed by them, to wit:

"Whereas, on November 20, 1900, an ordinance was passed by the Board of Mayor and Aldermen of Chattanooga, entitled, 'An ordinance granting T. S. Wilcox and associates,' etc.; and, whereas, said ordinance has been vetoed by Mayor Joseph Wassman, and is now pending for consideration and passage over said Mayor's veto. Now, therefore, we, T. S. Wilcox and associates, for ourselves and for our successors and assigns, in consideration of the rights, privileges and franchises which will be granted to . us, our successors and assigns, in event said ordinance finally passes over said Mayor's veto, hereby agree and expressly stipulate as follows:

"1. The maximum rate to be charged for telephones shall not exceed $36 per year for business telephones, and shall not exceed $24 per year for residence telephones.

"2. The actual work of constructing a new telephone system shall begin within twelve months after the date of the passage of the said ordinance over the Mayor's veto, and a new telephone exchange, capable of accommodating at least 1,000 subscribers, shall be ready for operation

within two years after the passage of the said ordinance. A failure to comply with either of these requirements, as to beginning work and putting exchange in operation, as aforesaid, within the time stipulated, shall cause all rights granted under said ordinance to cease and terminate.

"3. All pavements, streets and sidewalks in any way cut or disturbed by the undersigned, their successors and assigns, shall be restored and put in as good condition as before. A bond in the sum ' of $20,000, payable to said Mayor and Aldermen, shall be executed to insure the faithful performance· ' of this stipulation by said grantees.

"4. The rights and privileges granted under said ordinance shall not be directly or indirectly transferred to any rival or competing company, corporation or individual, or to any person or corporation already owning or controlling a telephone exchange within the city of Chattanooga.

"5. In lieu of the stipulations as to arbitration contained in section 7 of said ordinance, the following method, or plan of arbitration, may be adopted at option of said Board of Mayor and Aldermen, namely: The city shall select one arbitrator, the grantees shall select one, and, in the event these two arbitrators agree, their award shall be final and binding on the parties; but if said two arbitrators shall fail to agree, a third arbitrator shall be selected, or appointed by the Cir-

cuit Judge of the circuit in which Hamilton County, at the time of such arbitration, may be included, and the award of any two of the arbitrators shall be final and binding on the parties.

"6. It is expressly agreed and understood that, in case of such arbitration, looking to the purchase by the city of the conduits and subways which may be constructed by the undersigned, their successors and assigns, only the value of the physical, tangible conduits and subways shall be considered by the arbitrators in making their award. The city shall not be required to pay anything for the value of the franchises connected with said conduits and subways. But the city shall not exercise the right to acquire said conduits and subways, as provided in said ordinance until ten years from December 4, 1900, but may exercise the same any time thereafter.

"7. It is expressly agreed and understood that said ordinance shall not be construed to grant a franchise to operate a water plant, a gas plant, an oil plant, an electric light plant, nor any other plant except a telephone, or telegraph, or general electric plant, together with the right to construct and operate a system of conduits and subways, and place therein wires, pipes and other appliances of such companies, firms or individuals as may arrange with the owners of the franchises granted in the said ordinance for the use of such conduits and subways, and the right is re-

24 p—14

served to the city to utilize said conduits and subways for the electric fire alarm wires, without charge. Nor shall anything in said ordinance be construed to interfere with the city's right to make such use of its alleys, streets and lanes as it may desire for sewerage purposes or other municipal purposes. Nor shall anything in said ordinance be construed as preventing the city from hereafter granting to any individual firm, company or corporation the right to lay underground in the streets, alleys and lanes of the city his or its own wires, pipes or appliances.

"This December 1, 1900.

"T. S. WILCOX,

"For himself and associates.

"Now, therefore, be it ordained by the Board of Mayor and Aldermen as follows:

"SECTION 1. Be it ordained, That the maximum rate to be charged for telephones, under the franchise granted by the aforesaid ordinance and this ordinance, shall not exceed $36 per year for a business telephone, and shall not exceed $24 per year for a residence telephone.

"SEC. 2. Be it further ordained, That the actual work of constructing a new telephone system shall begin within twelve months after December 4, 1900, and a new telephone exchange, capable of accommodating at least ten hundred subscribers, shall be ready for operation within two years after said date, and that a failure to comply

with either of these requirements, as to beginning work and putting exchange in operation within the time stipulated, shall cause all rights, privileges and franchises granted under the aforesaid ordinance, and this ordinance, to cease and terminate.

"SEC. 3. Be it further ordained, That all pavements, streets and sidewalks, in any way cut or disturbed by the said T. S. Wilcox and associates, their successors and assigns, in the exercise of any of the rights, privileges and franchises granted by the aforesaid ordinance, and this ordinance, shall be by them restored and put in as good condition as before.

"Before exercising the right to so cut, or disturb any pavement, street or sidewalk, said T. S. Wilcox and associates, their successors and assigns, shall execute a bond in the penalty of ($20,000) twenty thousand dollars, payable to the Mayor and Aldermen of Chattanooga, to insure the faithful performance of this requirement.

"SEC. 4. Be it further ordained, That the rights and privileges and franchises granted by the aforesaid ordinance, and this ordinance, shall not be directly or indirectly transferred to any rival or competing company, corporation or individual, or to any person or corporation already owning or controlling a telephone exchange within the city of Chattanooga.

"SEC. 5. Be it further ordained, That in lieu

of the stipulation as to arbitration, contained in section 7 of the aforesaid ordinance, the following plan, or method, of arbitration, may be adopted at the option of the Board of Mayor and Aldermen of Chattanooga, viz.: The Board of Mayor and Aldermen shall select one arbitrator, the owner or owners of the franchise at the time of such arbitration shall select one arbitrator, and in the event the two shall agree, their award shall be final and binding on the parties. But if the said two arbitrators shall fail to agree, a third arbitrator shall be selected or appointed by the Circuit Judge of the Circuit in which Hamilton County may then be included, and the award of any two of the arbitrators shall be final and binding upon the parties.

"SEC. 6. Be it further ordained, That in case of an arbitration, under the aforesaid ordinance and this ordinance, looking to the purchase by the city of the conduits and subways which may be constructed by said T. S. Wilcox and associates, their successors or assigns, only the value of the physical, tangible conduits and subways, shall be considered by the arbitrators in making their award, and the city shall not be required to pay anything for the value of the rights, privileges and franchises connected with said conduits and subways.

"SEC. 7. Be it further ordained, That the city shall not exercise the right to acquire said con-

duits and subways, as provided in the aforesaid ordinance, and this ordinance, until ten years from December 4, 1900, but may exercise the same at any time thereafter.

"Sec. 8. Be it further ordained, That nothing in the aforesaid ordinance, or this ordinance, shall be construed to grant a franchise to operate a water plant, a gas plant, an oil plant, an electric light plant, or any other plant except a telephone or general electric plant, together with the right to construct and operate a system of conduits and subways, and place therein the wires, pipes and other appliances of such companies, firms or individuals, as may arrange with the owners of the franchises granted for the use of such conduits and subways.

"Nor shall anything in the aforesaid ordinance, or this ordinance, be construed to interfere with the city's right to make such use of its streets, alleys and lanes as it may desire for sewerage purposes or for other municipal purposes.

"Nor shall anything in the aforesaid ordinance, or this ordinance, be construed as preventing the city from hereafter granting to any individual, firm, company, or corporation, the right to lay underground in the streets, alleys and lanes, his or its own wires, pipes, or other appliances.

"Sec. 9. Be it further ordained, That the aforesaid ordinance, and this ordinance, taken together, shall determine the rights, privileges and fran-

chises granted to the said T. S. Wilcox and associates, their successors and assigns, and the terms, conditions and restrictions, and limitations under which the same may be exercised and enjoyed.

"SEC. 10. Be it further ordained, That the agreement signed by T. S. Wilcox, for himself and associates, and set out in full in the preamble hereto, shall be delivered to the auditor and preserved as a part of the records of this board.

"SEC. 11. Be it further ordained, That this ordinance take effect from and after its passage, the public welfare requiring it."

The amended ordinance, it will be observed, by noting and analyzing the several provisions of both, eliminated four of the five exceptions first suggested, and seems to have attempted to meet the fifth and two others indicated, if it did not entirely do so, by qualifying the exclusive feature of the right to build and maintain a conduit system for the use and rental incident granted, with a provision reserving the city's rights, and power to grant to any other individual, firm, company or corporation, the right to lay underground in the streets, alleys and lanes of the city his or its own wires, pipes, or appliances. The other objections added by the Mayor, that numerous franchises were granted, and that the plan of arbitration was defective, were obviated

by providing that the original ordinance shall not be construed to grant the right to operate anything except a telephone or general electric plant, and by means of or together with conduit and subway for necessary wires and appliances, and incidentally with rental privilege for space therein to others.

The suggestion that the proposed plan of arbitration was defective, is met by providing for a plan, in the event the city desires to take over the property, under which it will be impossible for the grantees to prevent arbitration. This feature is further safeguarded by providing that in such arbitration the city shall pay "only the value of the physical, tangible conduits and subways," and shall not pay anything for the franchise.

The provision for arbitration as to rates to be charged customers for space, is unchanged, but the objection to this is removed by allowing any person, firm, company or corporation to lay his or its own wires and appliances in the streets.

When these amendments were made to the original ordinance, it, of course, stood as though they were all incorporated into one, and being a contractual ordinance, was a mere tender of franchise and privileges, which might or might not be accepted. But, in the amendment made, the grantees' willingness to accept had been recited, and they did accept the grant as finally

tendered, and not thereafter disputed or complained of by the city, which is not a complainant, but defendant, to this litigation.

The bill in this case was filed by nineteen named resident citizens and taxpayers of Chattanooga, purporting to be on behalf of themselves and all other taxpayers, voters and property owners of Chattanooga, against the city itself, in its corporate representation of "Mayor and Aldermen," and against the alleged offending Aldermen, individually, and against Wilcox and his associates, Freeman, Johnson, Erwin, Cummings and Whitehead, to have the ordinance declared void, and, as complainants further pray in the bill, "to have the same cancelled and removed as clouds upon the title and rights of complainants and all other similarly situated citizens, voters and taxpayers."

The defendants all demurred to the bill, presenting every legal defense to it as a whole, and to its several parts in particular. The demurrer was overruled by Chancellor Bearden, sitting by interchange with Chancellor McConnell, who was incompetent by reason of relationship, and leave was given defendants to appeal, which they did, and assigned errors.

Without stating the various averments of the bill, it is sufficient to say that it alleged the invalidity of the ordinance upon its face, on numerous grounds, and also that it was void by reason of extraneous facts, in the procurement of

its passage. Much secrecy, negotiation, contracting and "conspiring" were alleged between the Aldermen and the grantees, but no specific fraud was averred, as the bill must be understood, notwithstanding its abundant characterizations of acts and motives of all concerned, nor is it anywhere charged that the Aldermen were, or were to be, in any wise profited by the transaction, nor that they were acting for self-aggrandizement.

Before the Court of Chancery Appeals, the defendants assigned numerous errors. It is not necessary to quote them here, but it is sufficient to say that they raised all the questions involved, and as later repeated before this Court.

The Court of Chancery Appeals sustained the decree of the Chancellor, holding the ordinance void, and defendants appealed to this Court. Here, again, it is proper to say that it is not necessary to go into a recitation or discussion of points there considered, because the questions of law upon which the decision of that Court is predicated are not specifically apparent from their opinion, the Judge who delivered it, having found the ordinance void upon the ground that it was not for a "public use, but for the private use, gain and emolument of Wilcox and associates, their successors and assigns," while discussing but not deciding several other questions, and the majority of that Court "concurred in the result, but not in all the positions taken or reasoning

Patton *v.* Chattanooga.

advanced in reaching it." The assignment of errors here to that decree is as follows:

The demurrer should have been sustained, and the bill dismissed, because:

1. Complainants do not show that they will sustain any injury which is not common to all members of the public, or that their tax burdens, will be, in any way increased.

2. Even if the city had no power to grant an *exclusive* franchise, complainants cannot attack the ordinance upon that ground. Such attack can only be made by some one claiming a right from the city in conflict with the exclusive feature of this ordinance.

3. The law does not prohibit the granting of more than one franchise to the same individuals. Whether or not it is wise to do this is a legislative question over which the Courts have no jurisdiction.

4. The fact that a member of a legislative body, State or municipal, has, by an ante-election pledge, as a result of a caucus, or by a promise previously made, agreed to vote in a certain way, does not affect the validity of the act for which he votes; and this is all the bill alleges against the manner and method of passing the ordinance.

5. A franchise ordinance becomes a contract. The Aldermen are the duly accredited agents of the city for making such contracts. It is neither unusual, improper, or illegal, but, on the con-

trary, it is proper and necessary for them to confer, consult and negotiate with parties seeking to enter into such contracts with the city. Nor does the validity of such ordinances depend upon whether or not the Aldermen happened to consult with the people who elected them, before voting.

6. The Board clearly had the power to grant the franchise. There was no irregularity in the passage of the ordinance. No fraud is charged. It is not charged, or even intimated, that the Aldermen were acting in pursuit of their own self-aggrandizement.

7. To maintain this bill the Courts must assume a veto power and annul an ordinance upon the ground that it is unwise.

8. The bill presents no judicial question for determination.

9. The use for which the ordinance permits the streets to be used is not a private, but a public work, and the city has ample authority to grant such permission.

In the view we take of the case, it is impossible for us to consider but two of these objections, the two embraced in numbers one, two, and eight, which, put together, make but two 'assignments.

They go to the questions, whether complainants have any right to bring this bill, or whether they present, for consideration, a judicial ques-

tion, and we are of the opinion that these questions must be answered in the negative.

The argument and the authorities on these propositions are concisely and fully presented in the brief of defendants' counsel, and we include them herein with only such comment and changes as are necessary to make them conform to an opinion.

By a judicial question, where the validity of acts of a municipal council are involved, is meant one the determination of which, under our form of government, is entrusted to the judiciary, as distinguished from the other co-ordinate departments, when, and only when, such question is made by a person who has suffered or is threatened with some special injury which he seeks to redress, or prevent.

No such question is made by the bill in this cause.

1. The bill not alleging that complainants will suffer any injury not common to the body of the citizens, complainants have no such interest in the subject matter as gives them a status to make any of the questions attempted to be made by the bill.

2. The complainants cannot, in any event, make the question that the city has no power to grant an exclusive franchise.

*Status of Complainants.* The bill is filed by citizens and taxpayers as such. It does not show

that they can possibly suffer any injury which is not common to the body of the citizens, and, complainants show no special injury or interest, and, therefore, cannot be heard to question the validity of the ordinance, and there is consequently no judicial question. Anticipating the line of argument in objection, we desire to state distinctly our positions and avoid the discussion of abstract questions, about which there is no disagreement. There is no question as to the jurisdiction of the Chancery Court to restrain municipal ordinances upon the ground that they are beyond the powers conferred upon the municipality, or that they were not passed regularly or according to the forms of law.

There is no question that any one who suffers, or will suffer, a special injury, may maintain a suit to test the validity of an ordinance upon either of these grounds, and that such a bill may be maintained by a taxpayer, as such, if the result of the ordinance will be to increase his tax burden.

What we decide is, that it is essential to the jurisdiction of the Court, in such a case, that there shall be an allegation that the effect of the ordinance, claimed to be illegal, will be to require of complainant the payment of a tax, to increase his tax burdens, or otherwise inflict an injury not common to the body of the citizens.

Courts do not sit to declare abstract proposi-

tions of law, or to determine for anyone, who
may desire to know whether laws or ordinances
are valid. They only determine the law as an
incident to granting relief. Hence, before the
Court can pass on the ordinance, it must ap-
pear that complainants seek some redress, or assert
some right which depends upon the validity or
invalidity of the ordinance. Now, what special
interest have these complainants in this matter?
The bill proceeds upon the theory, and only upon
the theory, that the result of the ordinance will
be injurious to the city at large—to the common
body of citizens. In all such matters—matters
which affect not the private rights of certain citi-
zens, but only those public rights which are com-
mon to all and incident to citizenship itself, the
law confers upon the duly elected representatives
of the people the sole right to appeal to the
courts for redress. It is only when he can go
further, and show some right which he has aside
from those rights which are incident to the mere
fact of citizenship, that he may, for himself, or
in behalf of others similarly situated, invoke the
conceded jurisdiction of the courts to restrain an
ordinance passed irregularly or without authority.
Matters of common interest, both of original ac-
tion and of redress, are entrusted to duly chosen
public officials, and, in such matters, the Chan-
cery Court is not open to confer upon private
citizens the right of public guardianship. In

short, such a bill as complainants present can be maintained only to protect private, and not pub-lic, rights.

"The power of courts to declare acts of legislation unconstitutional, exists only where they are called on to enforce them, or declare under them some right affecting life, liberty, or property." *Ford* v. *Farmer,* 9 Hum., 160.

It is a well settled rule that equity will not interfere by its injunctive process in a case like this, unless the complainants show that they will suffer some special injury, and not merely an injury in common with the body of the citizens. This rule is, we believe, without exception. There is a line of Tennessee cases in which taxpayers, as such, may maintain an injunction against public officials. But these are cases involving public revenues, and in which the result of the proposed action will be to increase the burden of taxation. It being proposed to increase the burden of taxation upon each individual taxpayer, he will sustain an injury not common to those citizens who are not taxpayers, and hence, as a taxpayer, on behalf of himself and other taxpayers, he has a status in court to contest the legality of the accomplished or proposed action. *Lynn* v. *Polk,* 8 Lea, 121; *Kennedy* v. *Montgomery Co.; Colburn* v. *Chattanooga.*

But these cases are strictly in line with the rule that complainants must be threatened with

an injury not common to the body of the citizens.

"As a general rule, taxpayers have no right to contest, in an equity suit, the validity of a grant of an exclusive privilege or franchise, or to enjoin a city from entering into a contract, unless they can show in both instances that they will sustain special injury by the municipal action." Tiedeman on Municipal Corporations, 395.

"Although the general doctrine that taxpayers are proper parties to invoke equitable relief against misconduct upon the part of municipal authorities is thus seen to be well established, it is not to be understood that they are entitled to maintain an action in all cases of this nature, regardless of their personal interest or of the degree of injury they may sustain." High on Injunctions, 301.

"Unless a party is liable to sustain some special injury different from that of all other taxpayers, or others in the vicinity, by the vacation of a public street, he cannot maintain a bill to enjoin the vacation." *Hessing* v. *Scott,* 107 Ill., 600.

"However commendable it may be in an individual to carry on a suit for the whole community, in the result of which he has no interest over any other member of that community, to urge the perpetuation of an injunction for the good of the city, such is not a fit case for

equitable interposition." *Jones* v. *Little Rock,* 25 Ark., 305.

"The plaintiff does not show with any reasonable certainty that he would sustain any injury by the contemplated action of the council. Without such showing we do not think he is entitled to an injunction." *Searle* v. *Abraham,* 73 Iowa, 508.

There are no Tennessee cases establishing any other doctrine than that where taxpayers show an interest beyond that of other citizens, they may maintain their bill.

Counsel have asserted that the foundation, in this State, for the jurisdiction invoked is *Bradley* v. *Commissioners,* 2 Hum., 432, where the organization of a new county, under an unconstitutional act, was enjoined at the suit of the taxpayers in the territory of the proposed new county. In this case the necessary interest of complainants was assumed without discussion. But later, in referring to this case, the same Judge, Judge Turley, shows that the interest existed because of "a necessary increase of taxation for public buildings and police expenditures." *Ford* v. *Farmer,* 9 Hum., 159.

In *Maury County* v. *Lewis County,* the jurisdiction was maintained upon the ground that Commissioners, by not conforming to a legislative act, had taken a part of the territory of Maury County and included it in Lewis County, and

24 P—15

that this invasion of the rights of the former county gave it a status in Court. 1 Swan, 245, 246.

In *Bridgenor* v. *Rodgers,* 1 Cold., 260, it was held that any taxpayer could enjoin the unconstitutional taking of a part of his county to form another, and Judge Wright said: "The spoilation of his county must, of necessity, result in an increase of taxation for public buildings and public expenditures, to his injury and wrong."

*Colburn* v. *Chattanooga,* 2 Shannon's Cases, 22: "Any taxpayer may bring his bill to prevent the corporate authorities of a city from acting *ultra vires,* where the effect will be to impose upon him an unlawful tax, or to increase his burden of taxation."

*Morris* v. *City of Nashville,* 6 Lea, 340. Suit to enjoin annexation of territory to city of Nashville by taxpayers of the territory. "The complainants had *prima facie* such a peculiar interest and such rights in regard to the question of annexation as warranted a resort to a Court of Chancery for their assertion and protection."

It was not deemed necessary in that case to say further that the city burdens thus imposed would add to the taxpayers' existing burden.

*Bouldin* v. *Lockhart,* 1 Lea, 200. The relief granted to a taxpayer was to enjoin the "further proceeding to erect the county seat at Tracy City, and to forbid the County Court from levy-

ing taxes or incurring further expense for this purpose."

*Lynn* v. *Polk,* 8 Lea, 21: "At the suit of taxpayers, an act was declared invalid which directed the funding of the public debt, and thereby required the levy and collection of additional taxes, and not only to avoid this burden, but to prevent its becoming irrevocable."

Thus examined, the Tennessee cases show that the Court had jurisdiction to pass on questions, admittedly of a judicial nature, only when such jurisdiction is invoked by those having a special or peculiar interest in the question, and there are none to the contrary.

In view of the uniform authorities on this subject, it is clear that complainants have no status in Court. What injury can this ordinance possibly do to them which is not common to all citizens? The ordinance does not deal with the question of taxation, and hence cannot affect their tax burdens. The streets, as streets, are not the property, in any sense, of individual citizens. A taxpayer has no more proprietary interest in them than any other citizen. They are the property of the common public. An abutting lot owner has a special interest in them, but only to the extent of his right of ingress and egress, or somewhat wider, as his deed may or not extend the fee to the center of the street. If this be impaired, he suffers a special injury, and

may maintain an action. But complainants make no claim of this kind. The whole theory of their bill is that the right to use the streets, as permitted by this ordinance, a right which does not belong to abutting lot owners any more than to other citizens, whether taxpayers or not, is a valuable right, which may, in the future, be of importance to the public. Complainants can sustain no injury in this respect which is not common to all members of the public.

Much has been said about whether the exercise of the franchises granted would impose an additional burden on the fee of the streets. We deem this question entirely immaterial. If there is no additional burden, the franchise confers a complete right to the use of the street. If, however, there will be additional burden, and we are not to be understood as implying that there is not, the franchise still makes the use of the street lawful—but the persons exercising the franchise may be required to pay damages for the additional burden. But this does not affect in any way the validity of the franchise. Nor does it afford any basis for an injunction now. The grantees may never use any street on which any of complainants own abutting property. Until they are about to use some such street, no one of complainants will be threatened with any injury or have anything to complain of. If it should happen that, in the exercise of the right granted,

the grantees should invade any private right of any one of the complainants, he, but not the other complainants, could maintain a proper action.

On this determination of the first proposition, complainants have no status in Court for any purpose, and their bill fails, regardless of the merits of the abstract questions made. Nor are complainants, or any of them, in an attitude to attack the ordinance upon the theory that it attempts to grant an exclusive franchise. They certainly have no status to make that question. We shall enter into no discussion of the power of the city to grant an exclusive franchise. It may be admitted that no such power exists. But this can give no aid to complainants. The want of this power could only make the exclusive feature invalid. The franchise might still be valid, though not exclusive. In this view, the effort to grant an exclusive franchise can furnish no ground for the interference of equity by injunction. It cannot be necessary to have this point adjudicated now, because, if the exclusive feature is *ultra vires,* it confers no powers, and it is well settled that nothing that may be done under the franchise will make it exclusive. *State v. Ohio,* 18 Ohio St., 263; *Grand Rapids, etc.,* v. *Grand Rapids, etc.,* 33 Fed. Rep., 659. (The case last cited is a most learned opinion by Judge Howell E. Jackson.)

Besides, whatever may be the conflict of authority upon some of the propositions discussed by counsel in this case, there is one proposition upon which, so far as we can find, the authorities are uniform. A taxpayer, as such, cannot test the validity of a franchise merely because it is exclusive. This question can only be made by one claiming the right to do something contrary to the exclusive feature.

In a case involving this point, the Supreme Court of Iowa said: "The ordinance purports to grant an exclusive right. Whether it was competent for the city to grant such right, we need not determine. If we should conclude that it was not, it is manifest that the ordinance would not be void. It would result merely that the right granted was not exclusive, and the plaintiffs, as mere taxpayers, cannot properly raise that question. Such question cannot properly be raised until a conflict arises between the American Construction Company (the grantees of the exclusive franchise) and some person or persons, or corporation, claiming also a right from the defendant city to construct and operate waterworks." *Dodge* v. *Council Bluffs,* 57 Iowa, 566. See, also, *Grant* v. *Davenport,* 36 Iowa, 406; Tiedeman on Municipal Corporations, 395.

Of course, as we have substantially stated in the foregoing part of this opinion, we are not deciding that this amended ordinance is exclusive or

non-exclusive, nor that it was in this respect valid, whether exclusive or not. But we have discussed the objections to complainants' proceeding against it, and held their bill is not maintainable, whether the ordinance is or is not exclusive, and is or is not valid, because complainants are in no attitude to question it. These holdings are none of them technical. They lie at the very foundation of the orderly conduct of municipal government. If cities could not exercise public powers, even erroneously or unwisely, when lawfully done by their constituted legislative authority, without the concurrence of every citizen or taxpayer, it would be impossible to have municipal government, and there never could be any certainty or permanence in municipal grants of franchises for public purposes. And if, when granted, they are open to other contest than that and by those indicated, no public work could ever be accomplished, and intolerable confusion and complication would prevail in every city of sufficient importance to have competing or conflicting interests in public grants, or discontented citizens to litigate all public acts not affecting their private interests. Besides, it would delay many and destroy more useful public enterprises requiring municipal authority. This case well illustrates the condition described.

The ordinance in controversy was passed on the 4th of December, 1900. The franchise granted was to be void if the work of construction of

the telephone system did not commence within twelve months. The time fixed for commencing the work lacks but a few days of expiring. This bill sought an injunction, but, it seems, none in fact issued. Yet the application and the questions attempted to be raised as to the validity of the proceeding were doubtless sufficient to delay the work until the right claimed was well nigh wholly lost, and until it may be seriously impaired in consequence of another provision requiring the completion of the exchange within a fixed short period. Had the litigation continued a few days longer, the claimed right of defendants, possibly a very valuable one, indeed, alleged in the bill to be of extraordinary importance and value, would have been wholly lost because of a contest made by parties not specially interested, and, therefore, not authorized to make the contest. It is, therefore, of extreme importance that these rules of law we have declared in accord with all the authorities, should be strictly observed by the courts in refusing for want of jurisdiction to entertain litigation not brought by parties specially injured or conflictingly interested, and thus avoid the ruinous consequences indicated. Cities can protect themselves—they must be allowed to do so unless their ordinances complained of are of the nature specified, in which individual rights or conflicting interests are specially and immediately involved. This is particularly true of in-

Patton *v.* Chattanooga.

junction litigations, in which valuable rights might be lost by lapse of time, where they are not brought by parties whose interests would be such as to save the time lost pending such litigations, which would not be the case in proceedings like the one before us, with or without injunction.

The decree of the Court of Chancery Appeals, to the contrary, affirming the decree of the Chancellor, is erroneous, and it is reversed and the bill dismissed with cost.