W. G. WILKINS *et al. v.* CHICAGO, ST. LOUIS & NEW
ORLEANS RAILROAD COMPANY *et al.*

*(Jackson.* April Term, 1903.)

1. **STARE DECISIS.** Decisions long acquiesced in and establishing rules of property will not be overruled.

While a court should not hesitate to overrule a decision which has been recently made, when fully convinced that it is erroneous rather than perpetuate error, yet a very different principle prevails when it has been acquiesced in for many years, and has established a rule of property; and in such case it should not be disturbed, indepentent of any doubts that may be entertained of its correctness. A greater evil can scarcely be imagined than the habitual fluctuation in judicial opinion as to questions affecting the rights, and regulating the .conduct of a whole community in relation to real property. When a decision or a series of decisions have established a rule of property, and more particularly a rule affecting the title to real estate, which has become generally known, and has been acted upon, such a landmark should not be disturbed. (*Post, pp.* 455-461.)

Cases cited and approved: Napier v. Simpson, 1 Tenn., 448; Talbot v. McGavock, 1 Yerg., 277; Nelson v. Allen, 1 Yerg., 376; Vance v. McNairy, 3 Yerg., 197; Mitchell v. Lipe, 8 Yerg., 179; Atkinson v. Dance, 9 Yerg., 427; State v. Hicks, 9 Yerg., 486; Thompson v. Watson, 10 Yerg., 368; Smith v. McCall, 2 Humph., 163, 166; Sherfy v. Argenbright, 1 Heisk., 143; State, ex rel., v. Whitworth, 8 Lea, 594; Case v. Joyce, 89 Tenn., 337; Pollock v. Farmers Loan & Trust Company, 158 U. S., 689; Sparrow v. Kingman, 1 N. Y., 242.

**2. SAME. Same. Case in judgment.**

A decision of the supreme court that a city was not bound by designation, on a map or plan, indicating that dedicated property was intended by the original proprietors to be used for a promenade, but that the city took the property as its own corporate property, acquiesced in for sixty-nine years, and treated as respects the particular land as establishing a rule of property, on the faith of which rights have been acquired, will not be disturbed on a bill filed by property owners seeking to enjoin contracts by the city affecting the property, on the ground that the city in respect thereto sustains toward complainants the relation of trustee. (*Post, pp.* 427-455, and especially 451-455.)

Cases cited and approved: Memphis v. Wright, 6 Yerg., 497; Hardy v. Memphis, 10 Heisk., 127; Adams v. Memphis, 2 Cold., 645; Napier v. Simpson, 1 Tenn., 448; Talbot v. McGavock, 1 Yerg., 277; Nelson v. Allen, 1 Yerg., 376; Vance v. McNairy, 3 Yerg., 197; Mitchell v. Lipe, 8 Yerg., 179; Atkinson v. Dance, 9 Yerg., 427; State v. Hicks, 9 Yerg., 486; Thompson v. Watson, 10 Yerg., 368; Smith v. McCall, 2 Humph., 163, 166; Sherfy v. Argenbright, 1 Heisk., 143; State, ex rel., v. Whitworth, 8 Lea, 594; Case v. Joyce, 89 Tenn., 337; Pollock v. Farmers Loan & Trust Company, 158 U. S., 689; Sparrow v. Kingman, 1 N. Y., 242.

**3. SAME. Same. Same. Were the question new, it would probably be held otherwise.**

Where the proprietors dedicated to a city a strip of land indicated on a town map or plan as the "Public Promenade," and the "Public Landing," by the registration of the map, which was accepted by the city, it would probably be held, if the question were new, that the public promenade became at once, upon the acceptance by the city, a perpetual pleasure ground for the people of the city, and that the municipal authorities had no power to sell it, or donate it, or in any manner contract it away, for railway purposes, or for any purpose foreign to that indi-

Wilkins v. Railroad.

cated by the name which the original proprietors gave to it, and that the legislature itself could not, acting constitutionally, empower the city authorities to make any such disposition of it, since that would be a disposition of the property of the citizens of the city without their consent, and that a court of equity should enforce the execution of such a trust, but the question was settled as stated in the second headnote in favor of the city's absolute ownership, and adverse to the rights of the citizens as beneficiaries of the promenade as a pleasure ground. (*Post, pp.* 449-451, 455.)

Cases cited, approved generally: Hardy v. Memphis, 10 Heisk., 127; Jacksonville v. Railroad, 67 Ill., 544; Cincinnati v. White, 6 Pet., 431; Watertown v. Cowen, 4 Paige, 510; Leclercq v. Gallipolis, 7 Ohio (7 Ham.), 217, pt. 1; Carter v. Chicago, 57 Ill., 287; Pierce v. Thompson, 48 Mo., 361; Warren v. Lynn City, 22 Iowa, 351; New Orleans v. United States, 10 Pet., 662; Church v. Portland (Or.), 22 Pac., 528, 6 L. R. A., 259; Sturmer v. Randolph County (W. Va.), 26 S. E., 532, 36 L. R. A., 300; Rowzee v. Pierce (Miss.), 23 South., 307, 40 L. A. R., 403, 65 Am. St. Rep., 625.

4. **MUNICIPAL CORPORATIONS.** Police powers cannot be surrendered, removal of obstructions from streets by bill in equity or by indictment.

A city can not legally annul the police powers which it possesses, or for any consideration agree to forego them. The authority is ample for the removal of obstructions upon the streets, on application of the State by bill in equity, or by indictment in the criminal court for the punishment of the offender and the abatement of the nuisance. (*Post, pp.* 461-463.)

Cases cited and approved: Railroad v. Chicago, 96 Ill., 627; Attorney-General v. London, 8 Beav., 270; Attorney-General v. Forbes, 2 Myl. & C., 123; Attorney-General v. Galway, 1 Molloy, 103; United States v. Duluth, 1 Dill., 469, Fed. Cas. No. 15001; People v. St. Louis, 10 Ill., 351; Newark Aqueduct Board, v.

Wilkins v. Railroad.

Passaic, 45 N. J. Eq., 393; Georgetown v. Alexandria Canal Company, 12 Pet., 91.

5. **SAME. Landowners having no special or peculiar interest cannot enjoin execution of city contracts, because they run for a long time.**

Landowners, having no special or peculiar interest different from that of other inhabitants of the city as to the length of time city contracts have to run, or as to the closing of the streets, have no right to present a bill upon these subjects for the purpose of restraining the execution of the contracts, because of the long time they have to run, nor because under such contracts the streets are closed or obstructed. (*Post, pp.* 463-464.)

Case cited and approved: Patton v. Chattanooga, 108 Tenn., 197.

6. **SAME. Landowners having no land abutting on streets have no special or peculiar interest authorizing their suit to enjoin closing of such streets.**

Landowners who do not own any land abutting on streets about to be closed by a contract with the city affecting the streets, have no special or peculiar interest authorizing them to maintain a bill to restrain the execution of such contract. (*Post, pp.* 464-465.)

Cases cited and approved: Brumit v. Railroad, 106 Tenn., 124, 138; Patton v. Chattanooga, 108 Tenn., 197.

7. **SAME. Owner of land abutting on streets may sue for damages for obstruction, and owner of fee therein is entitled to compensation for occupancy by steam railroad.**

Where there is an obstruction put upon a street which unlawfully impairs the easement of access of an abutting owner to his property, he may have his action for damages, and, from time to time, continuous actions of this character, until the nuisance is abated; and if he owns the fee to the center of the street, and a new or additional burden is put upon it, as the imposi-

Wilkins v. Railroad.

tion of a steam railway, he may have compensation for the value of his property so taken. (*Post, pp.* 464-465.)

Cases cited and approved: Railroad v. Bingham, 87 Tenn., 522; Harmon v. Railroad, 87 Tenn., 614; Railroad v. Doyle, 88 Tenn., 747.

8. SAME. Right of city to abandon streets, or to sell where it owns fee; right of access by abutting owner.

A city has the right to abandon a street, that is, its easement of way which it holds in trust for the public, if for the public interest, and upon such abandonment the fee reverts to the owners; but the city can not sell the land covered by the street unless it owns the fee, and can not even then do so in such way as to debar an adjoining owner from having access to his lot over the same, or at least over so much as leads from his lot to the next adjoining public street on each side. (*Post, pp.* 464-465.)

Cases cited and approved: State v. Taylor, 107 Tenn., 455; Attorney-General v. Railroad Company, 19 N. J. Eq., 394.

9. SAME. Interference by State, where city exceeds its corporate powers.

If a city has exceeded its corporate powers in making contracts for too long a time, or in closing its streets, the matter is one for interference or correction by the State, upon a bill filed for that purpose by the attorney-general, and a citizen can not maintain such action unless he has a special or peculiar interest in the matter. (*Post, pp.* 463-465.)

FROM SHELBY.

Appeal from the Chancery Court of Shelby County.—
F. H. HEISKELL, Chancellor.

CARROLL, MCKELLAR & BULLINGTON, for Wilkins *et al.*

J. M. DICKINSON, COOPER, HIRSH & COOPER, and W. B.
HENDERSON, for Railroad Company *et al.*

———

MR. JUSTICE NEIL delivered the opinion of the Court.

The case comes before us on bill and demurrer.    The
allegations of the bill necessary to be noted are the fol-
lowing:

That the city of Memphis as originally laid out was
the west part of the Rice grant, and its site appeared as
a town reserve on a plat attached to the deed of parti-
tion between the propietors of that grant, which was
surveyed on the twenty-eighth day of July, 1820, as ap-
pears of record in the register's office of Shelby county;
that the plat or map, as originally laid out in 1819,
showed between Bayou Gayoso on the north and Jack-
son street on the south an area or strip of ground desig-
nated as a public landing, and between Jackson street
on the north and Union street and Howard Row on the
south, and Mississippi Row (now Front street) on the
east, and the bank of the Mississippi river on the west,
a strip of land designated as the "Public Promenade,"
and that these words indicated unmistakably the pur-
pose of the proprietors; that by this map they dedicated

the said landing and promenade, as well as the streets, to the use of the public, and that, as to the landing and the public promenade, the purpose indicated was that they were not to be diverted to other and different uses than these thus specifically indicated by the use of the words themselves.

That prior to the passage of the taxing district act, approved by the governor on the thirty-first of January, 1879 (Acts 1879, p. 15, c. 11), the municipal authorities of the city of Memphis made no grant of any portion of the public promenade or public landing to railroad companies for stations or depot purposes, save only in the lease to the Memphis & Little Rock Railroad Company, as reorganized, of certain portions of the wharf, and of the center landing.

That this lease was recognized by the taxing district government, by a contract dated the ninth day of September, 1880.

That prior to this recognition the Mississippi & Tennessee Railroad Company, a corporation under the laws of Tennessee and Mississippi, by an agreement of date June 21, 1880, between it and the taxing district of Shelby county, claimed to acquire a right to lay down and maintain, from that date, a single railroad track, beginning at a point in the south side of Calhoun street, extending thence, crossing the north side of Calhoun street; thence northwestwardly through private property to the south side of an alley between Calhoun street and ————; thence crossing said alley, parallel

with Main street, to the south side of Butler street; thence crossing Butler street at about 245 feet west of Main street; and thence as set forth in the contract exhibited with the bill.

That the taxing district attempted to grant to the Mississippi & Tennessee Railroad Company the right to operate a branch track to connect the main track with the tracks of the Memphis & Charleston Railroad Company over the public grounds between Adams and Poplar streets, which by the terms of the contract was to terminate at the end of 40 years from its date.

That the third clause of this agreement was in the following words: "The right of way and occupancy herein granted to the railroad company for the construction and operation of said union passenger and freight railroad shall include only so much of the streets, alleys, and public grounds as may be occupied by the embankments, excavations, tracks, and bridges of the main track and branches herein specified; the taxing district only granting the right of way over public property, and none other."

That afterwards, on the first day of September, 1880, the Memphis, Paducah & Northern Railroad Company entered into a contract with the taxing district, whereby the municipality granted a lease for a track for the period of five years, and also the right to erect a temporary wooden depot building on the following piece of ground, to wit, that certain portion of the river front bounded on the east by Front Row, on the south by Poplar street,

on the west by Promenade street, on the north by Exchange street, being a strip of land about 50˙ feet in width by 250 feet in length.

That afterwards, on the twenty-sixth of April, 1881, the municipality entered into another contract with the last-named railroad company, whereby, among other things, it undertook to lease to the said company, for the term of 50 years, from the first day of May, 1881, to the first day of May, 1936, upon certain conditions set forth, the following public property: "Those lots of ground on the river front, lying on the east of Promenade street, and˙on the west of Front street, being bounded by Promenade street on the west, Front street on the east, by Market street on the north and by Poplar street on the south; and those other lots, bounded on the north by Union street, on the south by Beale street, on the east by Clinton street, and on the west by the line of the Mississippi & Tennessee Railroad extension; and also granted, or attempted to grant, to said railroad company the right and privilege of laying down, maintaining, and operating its tracks over and through said premises south of Market street, across said Market street, upon or under Promenade street to Auction street, and thence continuing north on that line to Bayou Gayoso, and along Promenade south to Market street, to the southern limit of the premises leased, on Poplar to Washington street, with the privilege of extending its main line and side tracks not more than three, over and across said first described premises, and

Wilkins v. Railroad.

over the square south of Poplar street to Washington."

That by the second clause of the contract just referred to it was provided as follows: "And upon said premises so leased to the aforesaid, the second party, its successors or assigns, may erect such substantial brick, stone, or iron depots for freight and passenger uses, and such platforms, main and side tracks, and such usual appurtenances, as they may deem proper for the transaction of their said business, and shall remove the banks or bluffs on said ground south of Union street so as to bring the same to the grade of Clinton street or the levee; but all these matters are always to be under the supervision of the district engineer."

That by this contract is was expressly provided that it was to determine whenever the said leased premises ceased to be used for railroad purposes by the railroad company, its successors and assigns.

That the successor to the Memphis, Paducah & Northern Railroad Company constructed a passenger depot on the leased premises, and closed up all the streets leading from the northern portion of the city to the river except Poplar street, and rendered Poplar street, between Front street and the river, practically useless by reason of the operation of the cars over and storage upon its tracks on the river front; that these tracks are over the public promenade and public landing before referred to.

That on the twentieth of March, 1893, the municipality attempted to enter into another contract with the

Illinois Central Railroad Company (the successor to the roads previously mentioned, except the M. & L. Railroad Company) for a period of 15 years, during which time it purported to grant to that company, for an annual rental of $500, the right to the use of Georgia street for the purpose of maintaining its then present and any additional tracks thereon, and that the contract provided for the erection of a foot passenger bridge.

That on the twenty-fifth day of March, 1895, and during the years 1900 and 1902, the municipality entered into contracts with other railroad companies (the Kansas City, Springfield & Memphis Railway Company, the Union Railway Company, and the Little Rock, Charleston & Memphis Railroad Company), none of which are made defendants to the bill, whereby these companies were allowed the privilege or right of building and operating tracks upon the said strip of ground known as the "Public Promenade" and the "Landing."

That, "notwithstanding these several legislative concessions, and the occupation of public property under them, the defendants the Chicago, St. Louis & New Orleans Railroad Company and the Illinois Central Railroad Company were not satisfied with the munificent donations of public property to them, but desired other and further gratuities, reasonably worth upwards of one million dollars, and consequently, on or about the 6th of June last (1902), addressed a petition of nine paragraphs to the legislative council of the city of Memphis, and therein prayed for the additional privileges desired

Wilkins v. Railroad.

by them; that they are substantially: (1) for authority to abandon the use of Poplar street station, and to authorize the premises to be put to any railroad uses for which they might be fitted; (2) for the extension of the three several contracts mentioned in the aforesaid petition for a period of time that will probably continue beyond the life of the present inhabitants of the city of Memphis; (3) for the right to lay and maintain such other tracks on Senatobia street as may be found convenient; (4) to cross Calhoun street; (5) to lay an additional track across Butler street, Shelby and Trezevant streets, and all intervening alleys; to connect with the existing tracks on Tennessee street, between Trezevant and Huling streets."

That, unless restrained by injunction, the prayer of the above-mentioned petition will be granted, and all the rights and privileges therein sought to be obtained will be conferred upon the defendant railroad companies, and that this grant will be of such serious moment that it will operate to destroy the public landing, the public promenade, and the use and occupation of several of the highways of the city of Memphis, for any purpose other than railroad purposes.

The complainants are W. G. Wilkins and twenty-six other residents of the city of Memphis, and the defendants are the Chicago, St. Louis & New Orleans Railroad Company, the Illinois Central Railroad Company, the city of Memphis, and its board of police and fire com-

missioners, and its board of supervisors of public works, the two composing the legislative council of the city.

The complainants describe themselves in the bill, and their interests to be affected by the matters complained of, as follows: "That they are severally property owners and taxpayers in the city of Memphis, county of Shelby, and State of Tennessee; that their property consists in part of real estate which is situated north of Union street, in the city of Memphis, and on Front street, between Union and Auction streets, some of it lying immediately east of the depot hereinafter more particularly described, and all of said property, in so far as its uses are concerned, and its rental value, directly affected by the administration of the municipal authorities of the city of Memphis, of the trust, hereinafter to be more specifically set forth."

Speaking further to the interest of the complainants, the bill alleges: "That just prior to these contracts the business houses on Front street yielded large and remunerative rents. The property was exceedingly valuable, occupied by some of the largest merchants in the city, who had a remunerative trade, and the streets that were closed, and injuriously affected through the railroad operation under the aforesaid agreements, afforded every facility for the passage of freights from said business houses, both on Front street to the river, and from the landing to said business houses. After the contracts were made, the railroads severally and exclusively occu-

pied with their tracks part of the landing and public promenade."

Again, speaking of the petition filed by the defendant companies with the municipal authorities, it is said that, if this is granted by the city, such action "will produce an irreparable injury to them, in that it will transfer and divert trade and traffic, and render the use of the property less desirable, and reduce the rental value thereof, without affecting the assessment value thereof."

The charges of the bill in respect of the trust are, in substance, that, by virtue of the plat or map which the original proprietors caused to be prepared and registered, containing the situs of the town or future city, the streets, the squares, the promenade, and the landing appearing thereon were dedicated to the public use, and that a trust was thereby created for the benefit of the citizens of Memphis, of which trust the municipality became the trustee; that this trust particularly affected the public landing and the public promenade, in that they were by such dedication devoted for all time to the uses indicated by this designation.

There is also filed with the bill an exhibit dated on the 18th of September, 1828, several years after the original dedication, which purports to explain the purposes of the original proprietors in making the original dedication, and to remove doubts which it states had arisen in respect of that purpose. Touching the streets and alleys, it is said in this instrument that it was the purpose of the proprietors that they should always remain

public streets and alleys, and subject to the same regulations that all streets and alleys are subject to in towns or cities. In respect of the promenade, the following language occurs: "In relation to the piece of ground laid off and called the 'Promenade,' said proprietors say that it was their original intention, is now, and forever will be, that the said public ground [be] for such use only as the said word imports, to which heretofore, by their acts for that purpose, it was conceived all right was relinquished, for themselves, their heirs, etc.; and it is hereby expressly declared, in conformity with such intention, that we, for ourselves, heirs, and assigns, forever relinquish all claims to the said piece of ground called 'Promenade' for the purpose above mentioned. But nothing herein contained as to the promenade shall be or bar the town from authorizing one or more ferries to be kept by the representative proprietors, their heirs or assigns, opposite said promenade, and south of any of the cross streets on the Mississippi Row."

As to the public landing, it was said in this instrument: "It was the original intention of the proprietors that there should on said ground forever be a landing or landings for public purposes of negotiation or trade, and that the same should be forever enjoyed for these purposes, obligatory on themselves, their heirs and assigns, but all other rights not inconsistent with the above public rights incident to the same, it was never the intention of the proprietors to part with, such as keeping a ferry or ferries on any of the public

grounds, an exclusive right which they have always held sacred, and never intended to part with in whole or in part." This instrument was signed by John Overton, one of the original proprietors, and by John C. McLemore, Geo. Winchester, and William Winchester, the latter described as "surviving owner."

It is charged that the contracts before mentioned constituted a diversion of this property to a use wholly different from that to which it was dedicated, and constituted a breach of duty on the part of the trustee.

It is insisted in the bill that the complainants have the right to come before the court in the present proceeding and have the breaches of trust complained of corrected, and further breaches restrained.

In respect of the depot complained of in the bill, it is alleged: "The owners of the property contiguous thereto, prior to the erection of said depot, took no steps in the premises, doubtless misled by the clause in the stipulation which referred to the further consideration of a greatly increased facility for commerce and travel resulting from the great continuous railway connecting from Memphis to the Atlantic Seaboard."

It is charged that the city of Memphis, either as originally constituted, or as the taxing district, was without power, through its legislative council or otherwise, to make these contracts referred to, first, because such action was a violation of the trust under which the property passed to the city, and, secondly, because it had no authority under its charter to make such contracts.

The defendant companies interposed the following grounds of demurrer, viz.: "(1) That the several contracts and ordinances in the bill of complaint set forth are legal and valid contracts and ordinances, and within the competency of the legislative council of the city of Memphis, and were within the legal competency of the taxing district of Shelby county, its predecessor, to make, enter upon, and ordain. (2) Because the said complainants in the said bill of complaint do not stand in such relation to such contracts and ordinances as to entitle them in law to call into question the validity thereof. (3) Because the said contracts and ordinances, if illegal, can be challenged and brought in question only by the public authorities, and not by private individuals. (4) Because the said complainants, and none of them, had or has shown any peculiar and particular injury by them, or by him or her, suffered and sustained, which entitles the said complainants, or either of them, to maintain the bill of complaint in the cause exhibited. (5) Because the said complainants, as shown by the bill, have acquiesced in the making of said contracts and ordinances, in the bill set forth, through a long period of time, during which these demurrants, as complainants well knew, were expending large sums of money upon the faith of the rights granted to them by said contracts and ordinances, whereby the said complainants are estopped to call in question the validity of said contracts and ordinances. (6) Because complainants, if entitled to proceed in this honor-

able court touching the matters in the bill set forth, have been guilty of laches, and have lost the right, if ever it existed, to call in question the validity of said contracts and ordinances, by the lapse of time."

The city of Memphis joined in all of these demurrers, except the fifth and sixth.

The chancellor sustained the demurrer and dismissed the bill, whereupon the complainants appealed to this court, and have assigned errors.

Elaborate and very able briefs have been filed upon both sides, and we have given to the case the care and attention which its importance required. One feature of the case that should be noted is that in their briefs and printed arguments counsel upon the respective sides of the case have not confined themselves to the facts set forth in the bill, but have referred to other matters, which are partly matters of which the court can take judicial cognizance, and partly facts alleged to be well known concerning the position, situation, and character of the property in controversy, although perhaps not of such a character as that the court can take judicial notice of them.

On the part of complainants the following matters are stated which are partly a repetition of some allegation in the bill, partly additional matters, to-wit: "That the principal contract of which complainant is made is the one dated July 31, 1902, between the city of Memphis and the two defendant companies, by which, it is said, all of the contracts specified in the bill, to which these

two roads are parties, are extended so as to expire on the first day of May, 1986; that by that contract the two companies referred to, among other things, are also granted the privilege of closing the following streets, viz., Main, from the south side of Gilbert to Walker avenue, west side of First alley to Barton avenue, and Main street to the present Illinois Central yards; that the effect of the contract is to confirm all of the rights and privileges theretofore granted under the contracts, which it enumerates, until May 1, 1986; that among the contracts thus confirmed is one dated August 15, 1887, by which the city of Memphis, then the taxing district, granted to the Newport News & Mississippi Valley Company, its successors and assigns, the privilege of closing Overton, Concord, Jackson, and Market streets from the west line of Front street or Chickasaw street to the east line of Promenade street, and Promenade street north of Market, and did thereby declare that said streets be closed for the term of 99 years from that date, and should not be public streets of the city of Memphis; that by the contract the Newport News & Mississippi Valley Company, its successors and assigns, were given the further right and privilege of erecting on said premises, or so much thereof as may be necessary therefor, such substantial and commodious buildings and sheds, of stone, brick, or iron, as are necessary and adaptable to such union passenger depot uses and purposes, and to lay down, maintain, and operate on said premises such railroad tracks as it may desire and

find necessary to accommodate the business of itself and other railroads now or hereafter entering the city at such union passenger depot; that the premises are described in the contract of date August 15, and also in the contract of date April 26, 1881, and are between Poplar and Market streets on the north and south, and between First and Promenade streets on the east and west; that the taxing district leased these premises, by the contract of August 15, for 50 years from the expiration of the term of the lease of April 26, so that under the contract of April 26, 1881, the term will expire on May 1, 1936, and by the contracts of July 31 and August 15, the term was extended to May 1, 1986; that it thus appears that "the trustees of the public promenade have granted a use of a part of the public promenade to the defendant railroad companies for a term of years, extending now more than eighty-three years, these uses being wholly inconsistent with and destructive of that particular use for which the public promenade was donated."

The complainants' counsel have also interspersed through the pages of their printed argument, photographic views, as follows: Three views of different portions of Front street, with corresponding portions of the promenade strip opposite; a view of Jackson street, one of the depots of the defendant companies, another of the depot of the Choctaw Company, another of the Choctaw depot and tracks, and still another of the present landing.

On the part of the defendants, the following addi-
tional facts not contained in the bill are brought for-
ward in their printed arguments: After averring that
the commercial interests of the city of Memphis are to
a great extent dependent upon the maintenance of those
conditions which have resulted from a slow growth and
development of the means and facilities of transporta-
tion and distribution of the vast commerce which moves
through that city, and after recurring to the fact that
the bill shows that for more than 20 years the local au-
thorities have by contracts and ordinances permitted
railroad tracks and structures upon those portions of
the public property located along the river banks, which
are noted on the original map of the city of Memphis as
"Public Landing" and "Public Promenade," it is aver-
red: That, of the nine railroads entering the city, the
bill shows that five have secured privileges of that char-
acter, and also that the Union Railroad Company, a belt
line connecting all of the railroads with each other and
with the various and numerous manufacturing estab-
lishments in the city, has been granted the right to run
its tracks over and across the promenade and public
landing, and that the map or photographic views intro-
duced by complainant, as above stated, show the physi-
cal conditions now existing along the river front, a gen-
eral statement of which is that, in addition to the struct-
ures before referred to, depots and tracks, there are
numerous other structures upon the said ground in con-
troversy.

That the course of the Mississippi river has greatly changed since the original plat was made; that 20 years ago deep water extended as far north as Poplar street (that is, to a point below the northern terminus of the promenade), and it was apprehended that the bluff south of and near that street would be eaten into by the current of the river; that the revetment of the opposite bank at Hopefield, by the United States, has resulted in the deposit of a large bar extending from the mouth of Wolf river to a point south of Jefferson street (a point south of the northern terminus of the "promenade"); that it is probably more than a half-mile from the foot of old Poplar street to the river across the sand bar; that there is no public landing north of Jefferson street, and that throughout a large part of the river front, cotton sheds and other buildings now stand where elevators were once located; that a square of the old promenade is now owned by the United States, and the post office, customhouse, and courthouse of the federal government are located thereon; that immediately south of the postoffice, another square is taken up by the Public Library, and south of that another by the engine house of one of the fire companies; that Front street, which runs east of the old promenade, is almost wholly given up to wholesale business houses, many of which are directly connected with the railroads by switches, by means of which car load lots of freight are received and delivered, and connection between the carriers by rail and by river are made

only on those grounds, and that, as shown by the ex-
hibits, there is no other locality in the city where such
connection can be made; that from north to south and
from south to north, over a part of the old promenade,
there is probably carried more than twenty times as
much freight as goes out and comes in by the river, and
far more in a single busy month than during the entire
lives of the original proprietors came in and went out of
the village they platted in 1820; that when the original
dedication was made, the Chickasaw Bluffs extended as
far north as Jackson street on the immediate river front,
and then receded a little from the river; that an in-
spection of the exhibit to the bill will show that no dedi-
cation whatever was made for a public landing from
Jackson street south; that all that portion of the river
was occupied by a precipitous bluff, and that it was on
this bluff that the public promenade was supposed to
be located; that no street whatever is laid off on the map
west of what was then Mississippi Row, and which is
now Front street, between Jackson street on the north
and Union street on the south; that there are some dot-
ted lines, which probably suggest strollways or drive-
ways, but that exactly what they mean is not clear; that
looking at this exhibit (the plat of 1820 filed with the
bill), it is entirely certain that on the whole of what is
now the river front of Memphis no means was provided
for the commerce of the city to reach the river; that
the public landing on that plat lies entirely north of

Jackson street (which marks the northern limit of the promenade), and is now entirely useless for commercial purposes; that no boat can reach it, and a large sand bar, which is many feet under water when the river is high, extends not only across what was then the public landing, at the mouth of Wolf river, but also down and in front of much of the bluff from Jackson to Jefferson streets; that the whole of what was called the "Public Promenade," from Union street north, has been cut down, commencing to slope at about what was Mississippi Row, and running thence by gradual decline to the river front; that this promenade ground is now what is called the Levee Front, and it is given up entirely—the river front of it—to commercial purposes; that it is evident that if the prayer of the bill can be granted and the property described on the plat as a public promenade be devoted to the uses of a public park, the river commerce of the city of Memphis will be absolutely destroyed.

Again, it is said by the defendants that the strip referred to as "The Promenade" was not accepted by the city as a promenade, but only as general public property; that this is evidenced by its dealings with the property; that it was never occupied or used as a promenade; that the assertion of the right to use it for general public purposes goes as far back as the case of *Mayor and Aldermen* v. *Wright,* 6 Yerg., 497, 27 Am. Dec., 489, which was decided in 1834; that in 1844 the right of the city was again asserted, and successfully, in a contro-

versy between persons claiming under the original gran-
tors and the city of Memphis, in reference to the rights
of the respective parties along the river front, which
point also included the west boundary of the prome-
nade; that the matters involved in said controversy were
submitted (as shown by the statement of facts contained
in *Hardy* v. *Mayor and Aldermen,* 10 Heisk., 127) to
Judges Turley, Green, and Reese (then members of this
court) as arbitrators; that they were to determine
whether the successors to the original grantors, or the
mayor and aldermen of the city of Memphis, had the
right to the alluvial lands on the margin of the Missis-
sippi river; that the controversy thus submitted was
determined by the arbitrators in favor of the city, and
that the dedication made by Overton, Jackson, and
Winchester was declared to be absolute and uncondi-
tional; again, that the rights of the city to mortgage,
and thus virtually to dispose of, the property in ques-
tion, or a part thereof, was successfully asserted, as
stated in the case of *Adams* v. *Memphis,* 2 Cold., 645,
decided in the year 1866; that the result is that at no
time since the organization of the city of Memphis has
that corporation ever treated the public promenade as
a promenade; that it has never inclosed, ornamented,
controlled, or managed it as such; that it has all the
time regarded and treated it as corporate property, to
be devoted by it to any legitimate corporate purpose;
that it has disposed of parts of it to private persons and
to corporations; that it has asserted these rights

in opposition to the representatives of the original grantors, and never at any time conceded to the representatives of such grantors or to any other persons, the right to remove said property from perfect municipal control.

Again, it is said by the defendants that there is nothing disclosed in the record regarding the use of the public promenade as such by the citizens of Memphis; that the bill fails to show that at any time since 1820 has the public promenade been used as a place of public recreation by the citizens; that if this fact had existed, without doubt the bill would have so stated, and that its silence on this subject is conclusive; that if the public during the past eighty years has never asserted any right to use "the so-called" promenade as such, it can hardly now be allowed to these complainants to assert the right after having acquiesced in a hostile use and when the rights of third parties have intervened.

Upon these facts extraneous to the bill, several contentions have been advanced. Among other things it is said, on the part of defendants, that the court should hold that the city never accepted the promenade as such, but only as public property which it might devote to any use deemed best for the public welfare. Again, it is urged that these facts show that the original purpose as to the promenade and the landing, by the change of time and circumstance, has been rendered incapable of accomplishment, or, at least, of preservation and enjoyment; that the city has made the best use of the prop-

erty that it could have been put to, under the new order of things, undreamed of by and unimaginable to the original proprietors; that this use is a public one, and such as a court of equity would have authorized if it had been applied to in the first instance; and, seeing that it has already been accomplished, and that the result is beneficent, considering, in the largest sense, the welfare of the whole city, its commercial importance, and its general material prosperity, the court should now sanction what has been done, or at least should decline to interfere.

It would, perhaps, be doing an injustice to eminent counsel to say that it is seriously urged that in the present state of the pleadings these consequences could be legally deduced, but rather it should be said that the points referred to are made more in the nature of weighty suggestions, with the purpose of indicating to the court the gravity of the matter under consideration, and that the real insistence of counsel on this subject is that while the court cannot, in general, on demurrer, look beyond the facts stated in the face of the bill, yet that it should consider as imported into the bill all pertinent facts of which it can take judicial notice, and that several of the facts above recited as extraneous to the bill are of that character, and, upon being considered in connection with the facts stated in the bill, present such a showing as would make it the duty of the court to decline to entertain the bill.

Passing this view of the case, we come to a considera-

tion of the grounds of relief insisted upon by the complainant.

We shall first consider the case made in respect of the strip of ground indicated on the old town map as the "Public Promenade" and the "Public Landing," laying aside the question made as to the closing of streets.

As to the strip of land referred to, it should be premised that the rights of the city and of its inhabitants must be predicated upon the original dedication, and that no weight can be attached to the instrument of September 28, 1828, eight years thereafter. The original dedication by the registration of the map or plan, and the acceptance of the city thereunder, whatever may have been the terms of that acceptance, must control.

But it is contended that under the original dedication the strip embracing the public promenade and the public landing passed to the city, and the title was vested in it as trustee for the purposes indicated by the words, and the high sanctions that protect and guard trust property are invoked in behalf of the complainants in respect of this property, and the court is urged to apply those principles in the present case.

It is stated that the public promenade became at once, upon the acceptance by the city, a perpetual pleasure ground for the people of the city, and that the municipal authorities had no power to sell it, or donate it,

or in any manner to contract it away, for railway purposes, or for any purpose foreign to that indicated by the name which the original proprietors gave to it, and that the legislature itself could not, acting constitutionally, empower the city authorities to make any such disposition of it, since that would be a disposition of the property of the citizens of Memphis without their consent.   It is said that a court of equity has the right to enforce the execution of such a trust, either upon the application of the owners of lots abutting upon a park or square, or upon application of the trustee; citing *City of Jacksonville* v. *Jacksonville Ry. Co.,* 67 Ill., 540, 544; *City of Cincinnati* v. *Lessees of White,* 6 Pet., 431, 8 L. Ed., 452; *Watertown* v. *Cowen,* 4 Paige, 510, 27 Am. Dec., 80; *Le Clercq et al.* v. *Trustees of the Town of Gallipolis,* 7 Ohio (7 Ham.), 217, pt. 1, 28 Am. Dec., 641; *Carter* v. *Chicago,* 57 Ill., 287; *Price* v. *Thompson,* 48 Mo., 361; *Warren* v. *Mayor of Lynn City,* 22 Iowa, 351; *New Orleans* v. *United States,* 10 Pet., 662, 730, 9 L. Ed., 573; *Hardy* v. *Mayor,* 10 Heisk., 127.   Numerous other cases are cited to the same general effect; among others, *Church* v. *Portland* (Or.), 22 Pac., 528, 6 L. R. A., 259; *Davenport* v. *Buffington,* 97 Fed., 234, 38 C. C. A., 453, 46 L. R. A., 377; *Sturmer* v. *Randolph County* (W. Va.), 26 S. E., 532, 36 L. R. A., 300; and *Rowzee* v. *Pierce* (Miss.), 23 South., 307, 40 L. R. A., 403, 65 Am. St. Rep., 625—all of them interesting and instructive cases.

The defendant's counsel, while not denying the sound-

Wilkins v. Railroad.

ness, in general, of the principles above recited, point to the absence in the bill of any allegation that the ground referred to as a promenade was ever accepted or used by the city as such, and to the facts, of which the court must take judicial notice, that a large portion of this place has been long cut down and used as a wharf by the city, and thereby rendered incapable of the original use intended and that this use as a wharf has been necessitated by the filling up of the old landing place by a sand bar; that on other parts of this same ground are the courthouse, customhouse, and postoffice building of the United States, located as far back as 1877, also the Cossett Library; that as far back as 1844 the city of Memphis ceded a portion of this land to the United States for a navy yard, and that in 1852 the latter reconveyed the property to the city, and that in 1857 the same portion of this property was mortgaged by the city to secure the bonds of the M. & L. Railroad Company, for the payment of which debt it was subsequently sold, and, as shown in the bill, for more than twenty years railway tracks have been permitted upon the land—all as facts negativing any application of the property to purposes of public amusement or recreation. So it is insisted that the complainants are left alone to a construction of the bare map, with the space marked off upon it and designated by the words "Public Promenade." And while conceding that, if the question were *res integra,* it should probably be held to be the true construction that this ground was intended only for a

pleasure ground, yet it is said that the question has been heretofore settled in this state by a decision rendered in 1834, and that that decision has become a rule of property in respect of the particular strip of land in controversy in the present case. The application of that case is the chief question for consideration.

The case referred to is *Mayor & Aldermen of Memphis* v. *Wright,* 6 Yerg., 497, 27 Am. Dec., 489. The case was decided in this city at the May term, 1834. The statement of facts upon which the decision was based is as follows: That the corporation of Memphis laid off part of the promenade in front of the city, on the Mississippi river, for a steamboat landing, and other parts for a landing for flatboats and other craft; that the charter of incorporation provided that the city should have power "to do all things necessary to be done by corporations"; that the mayor and aldermen enacted an ordinance forbidding flatboats and other water craft (other than steamboats) to lie in the steamboat landing, under a penalty of $1 per hour after the expiration of half an hour from the time the owner should be notified by the town constable to remove his boat or craft; that the defendant, in defiance of this ordinance, lay to at the steamboat landing with his flatboat for fifty hours after he was notified to remove; that a suit was brought before a justice of the peace to recover the penalty, when a judgment was obtained for $50, and an appeal was taken to the circuit court; that upon the trial in the circuit court the judge charged the jury, among other

things, "that if it were not proved to them that this landing was a public one, laid off, marked out, and designated as such by the proprietors, on the town plan, but that this landing was made on the ground laid off as a public promenade, they should find for the defendant"; that the jury found a verdict for the defendant, and, a motion for a new trial having been made, on the part of the plaintiffs, and overruled, they prosecuted an appeal in the nature of a writ of error to this court.

In this court, as appears from the brief of counsel for defendant in error, published with the opinion, it was contended, as in the present case, that there was no error in the action of the court below, "because the corporation of Memphis had no right or power to change or divert the public dedications as designated on the map, without the aid of a court of chancery, from their indicated purposes." Counsel for plaintiff in error relied upon the incorporating "act of 1826, chapter 115, and the general law in relation to the powers of corporations." Responding to these contentions as applicable to the judge's charge, this court, speaking through GREEN, J., said: "The part of the charge complained of assumes that a corporation cannot apply the public property of a town to any new use than that for which it was designated when the town was originally laid off. In this we are of the opinion the court erred. The public property belongs to the corporators, and may be appropriated by them to any use they may think proper. The mayor and aldermen are the representatives of

these corporators, and have vested in them all the right to dispose of, or apply to any use they may think proper, the public promenade, public squares, etc., which existed in the original proprietors. If this were not so, a thriving town would be exceedingly crippled in the exercise of its corporate rights. Few persons would have sufficient foresight, in laying off a town, to anticipate and provide everything that was calculated to promote its prosperity and good government. It must therefore be among the powers of a corporate town, having by its charter a right to do all things necessary to be done by corporations, to lay off new streets, squares, lanes and alleys, and other conveniences for the trade and comfort of the citizens, and by ordinances to regulate the manner in which they shall be used. These powers are 'necessary to be done' that the prosperity of the town may be promoted, and that its peace and order may be preserved." For these reasons the charge of the circuit judge was held to be erroneous, and the judgment was reversed.

It is perceived that the occasion of the decision was the establishment by the city of a steamboat landing on one portion of the promenade, and of a flatboat landing on other portions of it, and the regulation of these landings—uses foreign to the occupation of the ground merely as a promenade; and it is further perceived that in the broadest terms it was held by the court, in deciding that case, that the city was not bound by the designation upon the map indicating the uses for which the

property was intended by the original proprietors, but, acting through its board of mayor and aldermen, it might apply it to any new use deemed by them necessary or proper to promote the welfare of the city.

We need not consider whether this case was erroneously decided at the time; certainly it is opposed to the current of modern authority. But now, sixty-nine years after this decision was rendered, during which long period it has been treated and acted upon as the law governing this particular strip of land, as a rule of property, on the faith of which the city of Memphis has acted, and others have acted, claiming under that municipality, and in accordance with which rights have been acquired and money and labor expended—after this long time, and in the face of these considerations, shall this court overrule that decision? Would it be wise? Would it be right? Would it be just? We think not.

This court was confronted with a similar situation in 1881, when it decided the case of *State, ex rel.,* v. *Whitworth,* 8 Lea, 594.

In the case of *State* v. *Hicks, Ewing & Co.,* 9 Yerg., 486, 30 Am. Dec., 423, decided in 1836, the opinion of this court having been delivered by Judge Turley, it was held that the lands granted to Davidson Academy by the legislature of North Carolina were exempt from taxation for the period of ninety-nine years, whether in the hands of the original grantees, or in the hands of their vendees or subvendees. In 1881, the

comptroller of the State treasury attempted by manda-
mus to compel the trustees of Davidson county to as-
sess these lands for taxation, and the correctness of the
decision in *State* v. *Hicks, Ewing & Co.*, was directly
challenged in the above-mentioned case of *State, ex rel.*,
v. *Whitworth.* The court held that, if the question were
brought before it for the first time, it would have been
constrained to decide against the exemption, on the
ground that it would not pass to a vendee of the original
grantees unless there were words showing beyond a rea-
sonable doubt that such was the intention of the legisla-
ture, and that there was no such commanding evidence
of intention that the exemption should so pass; but fur-
ther held that the decision in the 9th Yerger case
had grown to be a rule of property, in respect of the
particular property involved, which should not be dis-
turbed.    The court said:

"The State, the county, and the city have acquiesced
in it for over forty years.    Upon its correctness capital
has sought investment in that 'territory,' and built val-
uable improvements thereon.    The petition makes a
solemn admission that since 1836 'this decision has been
treated by the profession as settling the question that
this property was exempt from taxes for the State,
county, and city.'    It has to all intents and purposes
become a rule of property, so far as a decision of the
highest court in the State can make and establish that
rule.    While a court should not hesitate to overrule a
decision which has been recently made, when fully con-

Wilkins v. Railroad.

vinced that it is erroneous, rather than perpetuate error, yet a very different principle prevails when it has been acquiesced in for many years and established a rule of property.     Judge Catron, in delivering the opinion of the court in the case of *Talbot* v. *McGavock, Lessee,* 1 Yerg., 277, referring to the decision of the court in the case of *Napier, Lessee,* v. *Simpson,* 1 Tenn., 448, says 'that he understood the bench and the bar, the legislature and the community, to have acquiesced, during the intermediate period of twenty years, in that decision as being the law, and a correct construction of the act of 1797, and that, with all possible deference to the opinion of others, it should not now be disturbed, independent of any doubts that may be entertained of its correctness.'

"In 1840 Judge Reese, in delivering the opinion of the court in the case of *Smith* v. *McCall's Heirs,* 2 Humph., 166, referring to the case of *Talbot* v. *McGavock,* says: 'If we doubted, as we do not, the correctness of the judgment in that case, we should still yield to its authority. A greater evil can scarcely be imagined than an habitual fluctuation in judicial opinion as to questions affecting the rights and regulating the conduct of a whole community in relation to real property.'

"In 1870, Judge Shields, a special judge, who delivered the opinion of the court in the case of *Sherfy* v. *David Argenbright et al.,* although overruling some decisions of the supreme court of Tennessee, made directly after the close of the war, in relation to the validity of con-

tracts founded upon the Confederate treasury notes, clearly recognizes the soundness of the law, as held by Judges Catron and Reese, in this strong language: 'When a decision or a series of decisions have established a rule of property, and more particularly, a rule affecting the title to real estate, which has become generally known, and has been acted upon, such a landmark should not be disturbed.' 1 Heisk., 143, 2 Am. Rep., 690. See, also, the opinion of Judge Whyte, in the case of *Nelson* v. *Allen*, 1 Yerg., 376. The exceptions to the rule, as thus established by the judicial decisions of the supreme court of Tennessee, may be found in the cases cited in the brief of counsel of *Vance* v. *McNairy*, 3 Yerg., 197, 24 Am. Dec., 553, and of *Mitchell* v. *Lipe*, 8 Yerg., 179, 29 Am. Dec., 116, but Judge Green, in delivering the opinion of the court in the case of 8 Yerg., overruling his opinion in the 3 Yerg. case, says: 'We feel the importance of adhering to former adjudications, and the mischief which results from a fluctuation of opinion on any question, yet question will sometimes occur where a point may be adjudicated without the benefit of all the authorities which could shed light upon it, and when a reconsideration of it is highly proper.' It is thus plainly seen that the reasoning of the learned judge, so far from forming a rule, tends to bring that case within an exception to what he acknowledges to be a sound and well-established rule of law.

"Chancellor Kent says: 'If a decision has been made

Wilkins v. Railroad.

upon solemn argument and mature deliberation, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it. It is by the notoriety and stability of such rules that professional men can give safe advice to those who consult them, and the people in general can venture to buy and trust, and to deal with each other. If judicial decisions were to be lightly disregarded, we should disturb and unsettle the great landmarks of prosperity.' 1 Kent, 415.

"Cooley, in his work on Constitutional Limitations, says: 'It will, of course, sometimes happen, that a court will find a former decision so unfounded in law, so unreasonable in its deductions, or so mischievous in its consequences, as to feel compelled to disregard it. Before doing so, however, it is well to consider whether the point involved is such as to have become a rule of property, so that titles have been acquired in reliance upon it, and vested rights will be disturbed by any change; for in such case it may be better that the correction of the error be left to the legislature, which can control its action so as to make it prospective only, and thus prevent unjust consequences.' Cooley on Con. Lim., 52. Judge Bronson, in the case of *Sparrow* v. *Kingman*, 1 N. Y., 242, says: 'That after an erroneous decision touching the rights of property has been followed thirty or forty years, and even a much less time, the courts cannot retrace their steps without commit-

ting a new error nearly as great as the one at first.' The construction given to a statute of a State by the highest judicial tribunal of such State is regarded as a part of the statute. See 2 Black, 603, and a long list of authorities cited."

Again: "A decision of this court which for eleven years has constituted a rule of property, of frequent application affecting titles to real estate, should be adhered to after repeated recognitions by this and the other courts of the State, regardless of whether it was originally correct or incorrect." *Case* v. *Joyce,* 89 Tenn., 337, 16 S. W., 147, 12 L. R. A., 519, citing and approving *Sherfy* v. *Argenbright,* 1 Heisk., 143, 2 Am. Rep., 690; *Atkinson* v. *Dance,* 9 Yerg., 427, 30 Am. Dec., 422; *Thompson* v. *Watson,* 10 Yerg., 368; and *Smith* v. *McCall's Heirs,* 2 Humph., 163-166.

And as said by Mr. Justice Brown of the supreme court of the United States, in a celebrated case (*Pollock* v. *Farmers' Loan & Trust Co.,* 158 U. S., 689, 15 Sup. Ct., 912, 39 L. Ed., 1108) : "I have always entertained the view that in cases turning upon questions of jurisdiction, or involving only the rights of private parties, courts should feel at liberty to settle principles of law according to the opinion of then existing members, neither regardless of, nor implicitly bound by, prior decisions, subject only to the conditions that they do not require the disturbance of settled rules of property. There are a number of questions, however, which it is more important should be settled in some way than that

they should be settled right, and, once settled by the solemn adjudication of the court of last resort, the legislature and the people have a right to rely upon such settlement as forever fixing their rights in that connection. Even 'a century of error' may be less pregnant with evil to the State than a long-deferred discovery of the truth. I cannot reconcile myself to the idea that adjudications thus solemnly made, usually by a unanimous court, should now be set aside by reason of a doubt as to the correctness of those adjudications, or because we may suspect that possibly the cases would have been otherwise decided if the court had had before it the wealth of learning which has been brought to bear upon the consideration of this case."

We must therefore adhere to *Mayor and Aldermen of Memphis* v. *Wright* as establishing a rule of property controlling the strip of land in controversy. It follows that the city does not, in respect of that property, sustain toward the complainants the relation of trustee, as alleged in the bill, and that the complainants do not sustain the relation of beneficiaries in such special trust, and that they cannot maintain the bill on that theory; and, further, it must be held, under the authority of the case referred to, that the city is the owner of the property, and had the right to make any disposition of it authorized by its charter. This is true both as to the "public promenade," and the "public landing;" the principle being the same as to each piece of property.

The complainants' second contention is that the municipal authorities of the city of Memphis did not have the power under the new charter, chapter 11, p. 15, Acts 1879, and the amendments thereto, to make the contracts complained of in the bill.

The powers given to the legislative council of the city under the acts referred to, so far as they bear upon the present case, are as follows: "To permit and regulate the laying of railroad tracks or iron, and the passage of railroad cars through the taxing district, and to remove such railroad tracks if they obstruct travel or do not conform to the laws of the taxing district; to make all suitable and proper regulations in regard to the use of the streets by street cars, and to regulate the running of the same so as to prevent injury or inconvenience to the public . . . to repair and keep in repair streets, sidewalks and other public grounds and places in the taxing district; to open and widen streets, to change the location or close the same, and to lay off new streets and alleys when necessary, and to have and exercise entire control over all streets and other public property of the taxing district; and they shall have power over all other affairs in the taxing district in which the peace, safety, or general welfare of the inhabitants are interested." Acts 1879, p. 16, c. 11, sec. 3, and page 98, c. 84, sec. 1.

It is insisted by the complainants that the contracts complained of are for too long a period, that they authorize the closing of certain streets, and the choking

of others with railway lines to such an extent as to interfere with travel, and that by these contracts the city ties its hands for a period of years, so that it cannot control the streets left open, and prevent their being filled with tracks to such an extent as to unduly impede the passage of persons and vehicles.

We have examined all of the contracts of the defendant companies, so far as they are exhibited with the bill, and find in them nothing that authorizes them to so impede any open street with tracks as to prevent the passage of persons and vehicles; and, so far as the city's having surrendered its power to control such streets, we find, in each of the defendants' contracts filed with the bill, a careful reservation by the city of its police powers over the territory which forms the subject of the contract; nor could the city legally annul these powers which it possesses, or for any consideration agree to forego them. Moreover, the authority is ample for the removal of such obstructions, if there be any, to the extent indicated, on application of the State by bill in equity (*Metropolitan City R. Co.* v. *Chicago,* 96 Ill., 627; *Atty.-Gen.* v. *London,* 8 Beav., 270; *Atty.-Gen.* v. *Forbes,* 2 Myl. & C., 123; *Atty.-Gen.* v. *Galway,* 1 Molloy, 103; *United States* v. *Duluth,* 1 Dill., 469, Fed. Cas., No. 15,001; *People* v. *St. Louis,* 10 Ill., 351, 48 Am. Dec., 339; *Newark Aqueduct Board* v. *Passaic,* 45 N. J. Eq., 393, 18 Atl., 106; *Georgetown* v. *Alexandria Canal Co.,* 12 Pet., 91, 9 L. Ed., 1012), or by indictment in the

criminal court, for the punishment of the offender and the abatement of the nuisance.

As to the length of time the contracts have to run, this is a matter in which the present complainants have no special or peculiar interest different from that of any other of the inhabitants of the city of Memphis, and hence they have no right to present a bill upon the subject. *Patton* v. *Chattanooga,* 108 Tenn., 197, 65 S. W., 414. If the city has exceeded its corporate powers in this regard, the matter is one for interference by the State upon a bill filed for that purpose by the attorney-general.

As to the closing of streets, this is likewise a matter in which complainants have shown no special or peculiar interest different from that of other inhabitants of the city, and, for the reasons above given, they have no right to maintain a bill based upon that feature of the case. *Patton* v. *Chattanooga,* supra. If the city has exceeded its powers, this is likewise a matter for correction upon a proceeding instituted in the name of the State. It is true that, where there is an obstruction put upon a street which unlawfully impairs the ease-ment of access of an abutting owner to his property, he may have his action for damages (*Railroad* v. *Bingham,* 87 Tenn., 522, 11 S. W., 705), and, from time to time, continuous actions of this character, until the nuisance is abated (*Harmon* v. *Railroad,* 87 Tenn., 614, 11 S. W., 703) ; and if he own the fee to the center of the street, and a new or additional burden is put upon it, as the

imposition of a steam railway, he may have compensation for the value of his property so taken. *Street Ry. Co.* v. *Doyle,* 88 Tenn., 747, 13 S. W., 936, 9 L. R. A., 100, 17 Am. St. Rep., 933. It is also true that the city has the right to abandon a street, that is, its easement of way which it holds in trust for the public, if for the public interests; and that upon such abandonment the fee reverts to the adjoining proprietors, if they own to the center of the street (*State* v. *Taylor,* 107 Tenn., 455, 64 S. W., 766), and that the city cannot sell the land covered by the street unless it owns the fee (*Id.*), and cannot even then do so in such way as to debar an adjoining owner from having access to his lot over the same, or at least over so much as leads from his lot to the next adjoining public street on each side. *Atty.-Gen.* v. *Morris & E. R. Co.,* 19 N. J. Eq., 394. But in the present case the complainants do not show that they own property abutting upon any of the streets purporting to be closed, and hence they have shown no such special or peculiar interest as will enable them to maintain the bill. *Patton* v. *Chattanooga,* supra. And see *Brumit* v. *Railroad,* 106 Tenn., 124, 138, 60 S. W., 505, and cases cited.

It results that we sustain the second, third, and fourth grounds of demurrer.

Having thus held that the complainants do not sustain such a special or peculiar relation to the matters in controversy as that they can maintain the bill, we do

110 Tenn—30

not think it proper to pass directly upon the question of the validity of the contracts assailed. Having held that they can be questioned only by the public authorities, or, as respects the streets, by some abutting owner thereon, in so far as they unlawfully affect his rights, in respect of such street on which his property abuts, or by the public authorities, it is manifestly improper that we should go into this matter any further without having before the court some party entitled to make the questions, if any there be, that may arise on that head, as to the existence of which, not having considered that matter, we intimate no opinion one way or the other. We have found it necessary to go into the question concerning the trust relation which the bill alleged that the city sustained towards the complainants, in order to ascertain and settle the status of the latter towards the matters in controversy, and in order to enable us to determine the second, third, and fourth grounds of demurrer. It is true that the discussion on that head bears to some extent upon the first ground of demurrer, but, for the reasons already stated, we do not pass upon that ground of demurrer. Nor do we pass upon the fifth and sixth grounds of demurrer.

It follows that, upon the grounds stated, the complainants' bill must be dismissed, with costs.